UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     CRIMINAL NO. 04-10387-RGS
                                  )
WILLIE DANCY                      )

POST-HEARING MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant, Willie Dancy, submits this Post-Hearing Memorandum In Support Of Defendant's Motion To Suppress Evidence to supplement the previously filed pleadings and to address issues raised during the evidentiary hearing conducted over the following dates:  November 15, 2005; December 20, 2005; and November 7, 2006.  For the reasons set forth below, as well as for those reasons set forth in defendant's initial Motion To Suppress Fruits of Illegal Arrest and supporting memorandum, the physical evidence seized and statements given by the defendant on December 8, 2004 must be suppressed.

The evidence at issue was obtained by members of the Brockton and Massachusetts State Police as the result of a de facto arrest of Mr. Dancy without probable cause in violation of the Fourth Amendment to the United States Constitution.  At the time that officers encountered Mr. Dancy inside a Brockton bar, he was not observed engaging in criminal activity and the police did not see him handling or carrying a weapon.  There was also no

reasonable suspicion upon which to conduct a pat-frisk of his person for weapons.

STATEMENT OF FACTS

For purposes of this supplemental memorandum, the defendant will focus primarily on the actions of Trooper Francis Walls ("Walls") of the Massachusetts State Police.  Trooper Walls was the officer who physically restrained Mr. Dancy immediately upon entering Boomer's Bar ("Boomer's") in Brockton, Massachusetts, on December 8, 2004.  The actions of Walls and his fellow officers in the minutes after entering the bar were tantamount to an arrest of Mr. Dancy without probable cause.

On the night of December 8, 2004, Trooper Walls was working in Brockton alongside local police officers in his capacity as a member of the Massachusetts State Police Gang Unit. Tr. 12/20: 50.[1]  Trooper Walls was working with fellow state trooper Sergeant Mark Kiley ("Kiley") on a plainclothes patrol in an unmarked car.  At around 9:00 p.m. that night, Walls received a general radio transmission from Detective Mark Reardon ("Reardon") of the Brockton Police.[2]  According to Walls'

─────────────────────

[1] Citations to the record will be in the format of date followed by page.  Thus, a citation to page 25 of the November 15 transcript will appear as 11/15: 25.

[2] The government has represented that it was informed by the Brockton Police that the recording or turret tape of this radio

2

testimony at the suppression hearing in this case, his memory was
that Reardon stated that he had just observed a male fire a
firearm in the air and then run into Boomer's.  Tr. 12/20: 51.[3]

Walls and Kiley responded to the call and drove to Boomer's.
Before entering the bar, Walls and Kiley met briefly with
Officers Hyland ("Hyland") and Cesarini ("Cesarini"), and
Detective Reardon of the Brockton Police.  Although Reardon had
lost sight of the person who fired the gun about a city block
away from the bar (Tr. 11/15: 53, 54), the group of officers
split up so they could search the notorious locale for anyone who
might fit the broadcast description.  Kiley and Hyland were with
Trooper Walls and they entered the bar through the rear door
while Reardon and Cesarini entered through the front door.

---

transmission does not exist due to some type of malfunction that
prevented the taping of transmissions in general over a two week
period including December 8, 2004.  Defendant is submitting a
turret tape recording for the Court's review which was turned
over by the government and contains recorded radio calls of all
other aspects of the arrest of Mr. Dancy on December 8, 2004.
The Brockton Police were apparently able to record everything
except Detective Reardon's radio description of the suspect due
to this apparent "malfunction".

[3]Detective Reardon testified that he never actually saw the
person who fired the weapon on the street enter Boomer's Bar.
Tr. 11/15: 53-54.  This discrepancy between the testimony of
these officers highlights the problems that have been created by
the Brockton Police's inability to produce the turret tape
recording of Detective Reardon's original radio call containing
the description of the shooter.

Trooper Walls was the first to enter Boomer's through the rear door and immediately saw Mr. Dancy walking toward him. Walls was readily identifiable as a police officer as he was wearing a Massachusetts State Police sweatshirt and his badge and sidearm were visible on his belt. Tr. 12/20: 55, 56. Mr. Dancy turned away from Walls as he, Sergeant Kiley and Officer Hyland entered the bar. When Mr. Dancy turned away from the officers, he did not run or act in a suspicious manner, he simply walked in the other direction. Tr. 12/20: 92. Walls recalled that as Dancy turned away, he moved his right hand toward his right jacket pocket. Walls then physically grabbed Dancy by the arm and a struggle began. Id.

Upon first seeing Mr. Dancy, Trooper Walls noted that he seemed to fit, although not in every respect, the description of the shooter that Detective Reardon had relayed over the radio earlier in the evening. That description was of a black male with a "cornrow" hairstyle who was wearing a sweatshirt with lettering on it and dark jeans. Tr. 12/20: 56. Reardon had also allegedly described the individual as looking like a person named David Taylor. Id.[4]

_____

[4]Officer Hyland testified that he heard Reardon's radio call and that he mentioned a gray sweatshirt, dark blue jeans, "and he mentioned a name." Tr. 12/20: 88. "I wasn't familiar with the name, and I can't recall who it was." Tr. 12/20: 88. The absence of the turret tape again makes it impossible to determine

Although Mr. Dancy was in fact a black male with a "cornrow" hairstyle, he was wearing a hooded sweatshirt, dark jeans, and a black leather jacket. Detective Reardon's radio transmission never mentioned that the shooter was wearing a black leather jacket. Tr. 12/20: 72. In addition, there were a number of other African-American men in the bar that evening who fit some, if not all, aspects of Reardon's general description including Mr. Michael Bourne. Tr. 11/7: 29, Suppression Hearing Exhibits 14 (booking photograph of Michael Bourne) and 3 (photograph of David Taylor). Lastly, when Trooper Walls and Officer Hyland grabbed Dancy, they had not been given confirmation by Detective Reardon, who was in the bar at that time, that Dancy was in fact the person he had just seen firing a gun out on the street. Tr. 12/20: 72.

At the moment that Mr. Dancy turned away from him, Trooper Walls ignored the very real possibility that he was not dealing with the person that Detective Reardon had described and he reflexively proceeded to restrain him by grabbing his right arm and hand. Upon grabbing Mr. Dancy's right hand, which was still in his jacket pocket, Trooper Walls felt a hard object through the jacket and inside Dancy's hand that he concluded was a gun.

---

whether Detective Reardon actually said over the radio that it was David Taylor that he saw or whether it was someone who "looked like" David Taylor.

Tr. 12/20: 58.  Walls yelled "gun" to the other officers and he
began to physically struggle with Mr. Dancy who was telling him
he did not have gun and to get off of him.  <u>Id</u>.

In the confusion that followed, Mr. Dancy was physically
restrained by both Trooper Walls and Officer Hyland.  Eventually,
Officer Cesarini also became involved and used pepper spray on
Mr. Dancy while he was being held down.  During the struggle,
Trooper Walls claimed he never released Mr. Dancy's right hand
for fear that he might pull a weapon out of his pocket.  Tr.
12/20: 74-75.  He claims to have maintained a grip on that weapon
in Dancy's pocket for the duration of the struggle.  <u>Id</u>.  In
stark contrast to this testimony, Walls also stated that at some
point during the struggle, Mr. Dancy was able to somehow get his
right hand out of that jacket pocket.  He went on to testify that
Dancy made an attempt to hand the gun's cylinder off to Michael
Bourne.  Tr. 12/20: 60-61.[5]

Once Mr. Dancy was subdued by Walls, Hyland, and a shot of
pepper spray from Cesarini, Walls testified that he himself
removed the .22 caliber handgun from the right pocket of the
black leather jacket.  Tr. 12/20: 73.  Walls stated that Hyland

---

[5]Officer Hyland, who was standing right next to Walls, never
saw Mr. Dancy try to hand anything to Michael Bourne.  He simply
saw the .22 caliber handgun hit the floor in the vicinity of the
struggle between Walls and Dancy and that is when the cylinder
apparently came loose from the gun's frame.  Tr. 12/20: 104.

was with him when he recovered the gun.  Id. Mr. Dancy was
arrested and taken back to the Brockton Police Department for
booking.  Michael Bourne ("Bourne") and Kevin Jones ("Jones")
were in the rear area of the bar where Mr. Dancy was restrained
by the police.  Jones was arrested and charged with possession of
a 9mm handgun that he apparently tried to discard in the area
where Mr. Dancy was standing when the police entered the bar. Tr.
12/20: 97.  Bourne was also arrested for acting in a disruptive
manner when the officers arrested Dancy and Jones.

<u>ARGUMENT</u>

I.   WHEN MULTIPLE POLICE OFFICERS PHYSICALLY RESTRAINED AND
     MACED MR. DANCY, THEY CONDUCTED A DE FACTO ARREST REQUIRING
     PROBABLE CAUSE.

A de facto arrest, requiring probable cause as opposed to
the lesser standard of reasonable suspicion, comprises a tier of
Fourth Amendment analysis of interactions between law enforcement
officials and citizens.  An arrest occurs when an officer, acting
on probable cause that an individual has committed a crime,
detains that individual as a suspect.  Probable cause exists when
police officers, relying on reasonably trustworthy facts and
circumstances, have information upon which a reasonably prudent
person would believe the suspect had committed or was committing

a crime.  See United States v. Maguire, 918 F.2d 254, 258 91st
Cir.1990), cert. denied.

In United States v. Trueber, 238 F.3d 79, 93 (1st Cir.2001),
the First Circuit laid out a series of factors for consideration
when trying to determine if a person has been subjected to a de
facto arrest before he or she is formally arrested.  These
factors include:  whether the person is confronted by law
enforcement officers in a familiar or neutral setting; the number
of law enforcement officers present at the scene; the degree of
physical restraint placed on the person; and the duration and
character of the encounter.  Id.

In Mr. Dancy's case, the immediate and aggressive actions of
Trooper Walls and his fellow officers transformed his encounter
with them into a de facto arrest requiring probable cause.
Police conduct will rise to the level of an arrest when "'a
reasonable man in the suspect's position would have understood
his situation," in the circumstances then obtaining, to be
tantamount to being under arrest."  See United States v. Zapata,
18 F.3d 971, 975 (1st Cir.1994)(quoting Berkemer v. McCarty, 468
U.S. 420, 442 (1984)).

Trooper Walls entered Boomer's and immediately saw Mr. Dancy
walking toward him.  Walls was wearing a Massachusetts State
Police sweatshirt and his gun and badge were visible on his belt.
Sergeant Kiley and Officer Hyland entered the bar with Walls.

Tr. 12/20: 92.  Upon seeing these police officers, Dancy turned
away, without running, and Walls immediately grabbed at his right
arm.  Dancy told Walls to let him go but he was wrestled to the
ground by Walls and Hyland.

For purposes of determining the issues placed before the
Court in Mr. Dancy's Motion to Suppress, the defendant argues
that the weight of the credible evidence produced at the
suppression hearing suggests that Trooper Walls did not see Mr.
Dancy make any suspicious movement toward his jacket pocket as he
turned away from the police.  Officer Hyland, who was standing
right next to Walls at the critical time, did not testify that he
saw Dancy make such a movement.  Tr. 12/20: 92.  Detective
Reardon testified that he spoke directly to Trooper Walls in the
immediate aftermath of the arrest and that Walls told him
everything that happened with Dancy.  Tr. 11/15: 55.  He
incorporated this information into his arrest report.  Reardon
stated in his arrest report that upon seeing Walls, Dancy turned
away and walked in the opposite direction.  Suppression Hearing
Exhibit 7.  There is no mention in the report of any suspicious
movement of Dancy's right hand toward his jacket pocket or that
Walls was in fear for his safety as result.  Id.

Finally, the Government's Memorandum of Law in Opposition To
Defendant's Motion to Suppress Evidence presents the same factual
scenario as do Officer Hyland and Detective Reardon.  In its

9

pleading, the Government took the position that Mr. Dancy turned and attempted to flee when confronted by Walls and the other officers.  See Government's Memorandum pp. 5, 14 ("Upon seeing the officer, this suspect, on that Trp. Walls believed to be armed with a loaded handgun, turned abruptly and attempted to flee.").  There is never any mention of a suspicious hand movement observed by Walls in the Government's filing.

If the Court agrees that Dancy simply turned to walk away, then the physical restraints imposed upon Mr. Dancy by Trooper Walls and Officer Hyland were excessive under the circumstances. In addition, the Court must consider any other coercive factors involved in the encounter.  For example, the number of officers present who were involved in restraining Dancy.  Along with Trooper Walls, there were at least three other officers present who either became physically involved with Mr. Dancy or who were in his immediate proximity.  There were five or more police officers in the bar at the time of the encounter with Dancy. Officer Hyland and Sergeant Kiley entered the bar with Trooper Walls.  Officer Cesarini approached the area of the pool tables, where Mr. Dancy was located, with his weapon drawn.  Tr. 11/7: 18.  Detective Reardon followed him.  Cesarini eventually became directly involved with Dancy when he attempted to handcuff him and then used pepper spray on him.  Tr. 11/7: 20.

The physical restraint and macing occurred **before** the .22 caliber firearm was actually picked up off of the floor by Officer Hyland and Mr. Dancy was formally arrested.  Emphasis Added.[6]  When these armed police officers wrestled Mr. Dancy to the ground and then maced him, they imposed restraints on his person that were "'comparable to those of a formal arrest.'"  See United States v. Quinn, 815 F.2d 153, 156-57 (1st Cir.1987)(quoting Berkemer, 468 U.S. at 441).  Moreover, this was much more than *de minimis* physical contact and any reasonable person in Dancy's position would have understood his situation "to be tantamount to being under arrest."  Zapata, 18 F.3d at 975; contrast United States v. Young, 105 F.3d 1 (1st Cir.1997)(police officer lunging at a suspect from the window of a police car and brushing his hand against him did not elevate the encounter from an investigative stop to a de facto arrest).

If the Court agrees that Walls and his fellow officers conducted a de facto arrest, it must also conclude they did not have probable cause upon which to do so.  When the officers entered Boomer's, they were not sure that they would find the

---

[6]The testimony of Trooper Walls and Officer Hyland is again at odds regarding how the .22 caliber handgun was recovered. Walls testified that he recovered the firearm, or a portion of it, from the pocket of Dancy's leather jacket.  Hyland testified that he recovered the .22 himself from the floor of the bar in the area of the struggle with Dancy.

person who Detective Reardon observed firing a gun in the
vicinity.  Detective Reardon himself admitted that he never saw
the shooter enter the bar.  Tr. 11/15: 53-54.  This was a
calculated guess, at best, and the foray into Boomer's was really
a fishing expedition that involved random warrant checks on any
and all African-American males who were present in the bar.  Tr.
11/7: 27

Further, upon entering the bar, the police officers did not
observe Mr. Dancy in possession of a weapon or engaged in any
conduct that could be defined as criminal.  Moreover, fitting
some, but not all aspects of the description broadcast by
Detective Reardon did not give Trooper Walls probable cause to
conduct an arrest of Mr. Dancy.  Mr. Dancy was wearing a black
leather jacket and that was not a part of Reardon's radio
description of the suspect.  Finally, Trooper Walls'
representation that he "felt" a firearm in Mr. Dancy's hand,
while it was inside his jacket pocket, does not itself create
probable cause.  This was an assumption or guess on the part of
Trooper Walls since he never saw what was actually inside of Mr.
Dancy's right pocket during the struggle.[7]

---

[7]Detective Reardon testified that Mr. Dancy was in
possession of at least one cellular telephone when he was
arrested.  Tr. 12/20: 34.  It is just a plausible that what
Trooper Walls felt through both the leather jacket and Dancy's
hand was that telephone.

12

The credible evidence presented at the suppression hearing indicates that the .22 caliber handgun was not discovered in Mr. Dancy's jacket pocket.  Rather, it was picked up off of the floor by Officer Hyland in the area of the physical struggle with Dancy.  Tr. 12/20: 104.  Coincidentally, this was the same area where Officer Hyland observed Kevin Jones slide a 9mm handgun along the floor under a pool table.  See Officer Hyland's report/ diagram, Exhibit 12.  For all of the reasons stated, the officer's present did not have probable cause to conduct an arrest of Mr. Dancy.

II.  THE REASONABLE SUSPICION REQUIRED TO INITIATE AN INVESTIGATORY STOP AND/OR PAT-FRISK FOR WEAPONS DID NOT EXIST WHEN TROOPER WALLS AND THE OTHER OFFICERS FIRST ENCOUNTERED THE DEFENDANT.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Id. at 22.  To withstand scrutiny, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989)(quoting Terry, 392 U.S. at 27)(internal quotations omitted).

Where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances.  United States v. Hurst, 228 F.3d 751, 757 (6th Cir.2000); See also Terry, 392 U.S. at 10.  In evaluating whether there was reasonable suspicion, "we first determine whether the officer[s'] actions were justified at [their] inception, and if so whether the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop."  United States v. Trueber, 238 F.3d 79, 92 (1st Cir.2001).  The second inquiry is whether the scope of the investigatory stop was reasonable under the circumstances. Id.

When determining whether reasonable suspicion exists, the totality of the circumstances known to law enforcement officers at the time of the stop is examined.  This necessarily encompasses a review of the relative experience of the officers involved as well as the behavior and characteristics of the suspect.  United States v. Quinn, 83 F.3d 917, 921 (7th Cir.1996).  Police can sometimes consider otherwise innocent behavior in determining whether reasonable suspicion exists to detain a person.  See Terry v. Ohio, 392 U.S. 1, 22-23 (1968).

14

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops ... and ... 'de facto arrests.'" <u>United States v. Zapata</u>, 18 F.3d 971, 975 (1st Cir.1994).

In Mr. Dancy's case, reasonable suspicion did not exist for the following reasons:  there was an important discrepancy between the dispatch description and Mr. Dancy's actual appearance; Detective Reardon never saw the person who fired the weapon enter Boomer's; and Mr. Dancy's behavior in the bar was not suspicious or threatening.

Although, as stated above, Mr. Dancy appeared to fit some aspects of the description transmitted by Detective Reardon (black male, sweatshirt with lettering, "cornrow" hairstyle), he was wearing a black leather jacket.  Detective Reardon testified that the person he saw on the street who fired the weapon was not wearing a jacket.  In addition, there were other black males in the bar, including Michael Bourne, who fit various aspects of the description given by Detective Reardon.  See Exhibit 14 (booking photo of Michael Bourne).

It is well established that the police do not have to gamble with their safety when conducting investigations and are allowed to conduct a pat-frisk for weapons when the circumstances warrant it.  However, such searches are not to be conducted as a matter of course during every investigative detention.  See <u>Ybarra v.</u>

15

<u>Illinois</u>, 444 U.S. 85, 91-93 (1979).  An officer can conduct a
pat-down search for weapons when "he or she harbors an
articulable and reasonable suspicion that the person is armed and
dangerous."  quoting <u>United States v. Davis</u>, 94 F.3d 1465, 1468(
10th Cir.1996).  An officer's suspicion must be "articulable"
because, "in determining whether the officer acted reasonably...,
due weight must be given, not to his inchoate and
unparticularized suspicion or 'hunch,' but to the specific
reasonable inferences that he is entitled to draw from the facts
in light of his experience."  <u>Terry</u> 392 U.S. at 27.

     In Mr. Dancy's case, Trooper Walls and the other officers
present were playing a "hunch" when they entered Boomer's looking
for the shooter.  They did not know if that person entered the
bar or not and Mr. Dancy did not fit the description in that he
was wearing a black leather jacket.  If the Court agrees that the
weight of the credible evidence presented at the suppression
hearing suggests that Dancy simply turned and walked away from
Walls when the police entered the bar, then Dancy did nothing
suspicious or threatening.  Therefore, there was no need for a
pat-down search for weapons by Trooper Walls or the other
officers.

     In its memorandum, the Government cites the case of United
<u>States v. Maguire</u>, 359 F.3d 71 (1st Cir.2004) in suggesting that
what the police did with regard to Mr. Dancy could, in addition

16

to being a valid arrest predicated on probable cause, also be considered a valid <u>Terry</u> stop.  Dancy's case is distinguishable from <u>Maguire</u> in one significant way; the officers in that case actually observed what they believed was a weapon in the waistband of the suspect.  <u>See</u> <u>Maguire</u>, 359 F.3d at 74-75 .  In that case, a large kitchen knife was taken from the suspect.  <u>Id</u>.

If <u>Maguire</u> stands for the proposition that the boundaries of a <u>Terry</u> stop are flexible and that they are dictated by the objective observations of the police during the course of the stop, then more physical restraints can be imposed by the police in a situation where they actually observe a weapon on a suspect. In this case, Trooper Walls and his fellow officers saw no weapon before pouncing on and macing Mr. Dancy.  These actions, in addition to the number of police officers present and Cesarini's drawing of his weapon, therefore exceeded the boundaries of a <u>Terry</u> stop under these particular circumstances and transformed the encounter into a de facto arrest.

<u>CONCLUSION</u>

For the reasons cited above, the defendant's motion to suppress the fruits of his illegal arrest should be allowed.  The evidence suppressed would necessarily include the physical evidence allegedly obtained by the police in the aftermath of the

arrest (firearm, ammunition) and any statements allegedly made by the defendant while in police custody.

WILLIE DANCY
By his attorney,

/s/Oscar Cruz, Jr.
Oscar Cruz, Jr.
   B.B.O. # 630813
Federal Defender Office
408 Atlantic Ave., 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Oscar Cruz, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participant, Assistant United States Attorney Antoinette E.M. Leoney, as identified on the Notice of Electronic Filing (NEF)and paper copies will be sent to those indicated as non-registered participants on December 11, 2006.

/s/Oscar Cruz, Jr.
Oscar Cruz, Jr.

18