UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) CRIMINAL NO. 04-10387-RGS |
| v. | ) |
| | ) |
| WILLIE DANCY | ) |

**GOVERNMENT'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S**
**<u>POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS</u>**

The United States of America, by and through its attorneys, Michael J. Sullivan, United States Attorney, Assistant U.S. Attorney Antoinette E.M. Leoney, submits this supplemental response to Defendant's post-hearing memorandum in support of motion to suppress.  In addition, the government relies on its previously filed memorandum of law in opposition to this motion to suppress, and suggests that the exhaustive testimony of the police officers and state troopers as well as the evidence offered at the suppression hearing, clearly support the government's contention that the officers' conduct in approaching Dancy in Boomer's Bar, did not constitute a seizure, and thus the Fourth Amendment was not initially implicated here.  And, even if, as Dancy puts forth, he was seized from the inception of the encounter, his seizure was a valid <u>Terry</u> stop supported by reasonable, articulable suspicion.

Dancy argues for the suppression of statements made by him on December 8, 2004, and of the .22 caliber handgun and its ammunition found on his person by law enforcement officers in

Brockton, MA, following the public discharge of a firearm. Although Dancy characterizes this as a supplementary motion, "to address issues raised during the evidentiary hearing conducted over . . . November 15, 2005; December 20, 2005; and November 7, 2006," the main issues brought forth here have previously been addressed and responded to in the parties' earlier pleadings.

Dancy avers here that the discovery of his sidearm and ammunition was the result of a seizure that instantaneously developed into a *de facto* arrest, and that this arrest was illegal for lack of probable cause. As such, he maintains, the resulting evidence should be subject to suppression under the rubric of the exclusionary sanction.

Dancy's repetition of flimsy arguments continue to run counter to both the facts and governing case law, as his arrest by seasoned law enforcement personnel was firmly grounded in probable cause. The reasonable belief that Dancy had committed a crime only minutes before his arrest sprang from reliable and accurate information observed by one of the arresting officers.

Again, assuming arguendo, as Dancy puts forth, that his arrest was unsupported by probable cause, his seizure was a valid <u>Terry</u> stop that did not rise to the level of a *de facto* arrest. This brief investigatory detention did not exceed the permissible

levels of a Terry intrusion.  The police clearly acted reasonably under the circumstances, as any interference with Dancy's Fourth Amendment rights were justified given the overarching safety risks faced by the officers and the patrons of Boomer's Bar.  The discovery of a firearm and ammunition was the factual result of good police work.

ARGUMENT

I.   DANCY'S SEIZURE DID NOT EXCEED THE PERMISSIBLE BOUNDARIES OF AN INVESTIGATORY DETENTION AND DID NOT, AT ANY POINT, RISE TO THE LEVEL OF A DE FACTO ARREST REQUIRING PROBABLE CAUSE.

Dancy focuses on the single frame of his seizure, attempting to render meaningless the motion picture of the situation.  He argues that in the instant between the seizure and when Trp. Frank Walls felt his sidearm, the interaction moved beyond the permissible boundaries of a Terry stop.  It is unquestioned that once Trp. Walls discovered Dancy's gun, probable cause existed to disarm and arrest him.  This split-second contact between officer and suspect before the firearm was discovered did not elevate the situation to a de facto arrest.  Dancy's claim to the contrary finds shelter in neither relevant case law nor common sense.

De facto arrest occurs either when a Terry seizure exceeds the scope of a normally permissible investigatory detention, or when a suspect is restrained in a manner associated with formal

arrest.  See Maquire, 359 F.3d 71, 77 (1st Cir. 2004).  Although there is no "scientifically precise formula that enables courts to distinguish between investigatory stops and de facto arrests," a court must evaluate the entirety of the circumstances leading up to the restraint of a suspect.  Id. (quotations and alterations omitted).  The relevant inquiry rests on "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 441 (1984).

In United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001), the First Circuit laid out a series of factors for consideration when trying to determine if a person has been subjected to a *de facto* arrest before he or she is formally arrested.  These factors include: 1) whether the person is confronted by law enforcement officers in a familiar or neutral setting; 2) the number of law enforcement officers present at the scene; 3) the degree of physical restraint placed on the person; and 4) the duration and character of the encounter.  Id.

In this case, as in Trueber, the encounter occurred in neutral surroundings, in Boomer's Bar; while a number of police officers were present at the scene, few came into direct contact with Dancy, and the information gleaned by the officers (including Trp. Walls) before entering the bar and the actions

taken by the Dancy during the stop, warranted a thorough, rather than cursory investigation. Id. Furthermore, "[m]ere numbers do not automatically convert a lawful *Terry* stop into something more forbidding." United States v. Zapata, 18 F.3d 971, 976 (1st Cir. 1994).

Dancy couches his argument that he "understood being grabbed by the officer...to amount to no less than an arrest" in the split-second physical contact administered by Trp. Walls. See Def.'s Post-Hrg Memo at 4. The First Circuit roundly rejected this type of argument in Maguire. They stated that winnowing the scope of inquiry to "the discrete moment" of seizure by physical contact "without considering the totality of the circumstances" was to commit error. See Maguire, 359 F.3d at 77-78.

In spite of this, Dancy claims that the physical nature of his seizure transformed it into a de facto arrest. Physicality during a Terry stop does not alone bring arrest, as an officer touching a suspect "merely establishes that a seizure occurred." Zapata, 18 F.3d at 977. The Zapata Court also opined that an "investigatory stop necessarily carries with it the right to use some degree of physical coercion" against the suspect. 18 F.3d at 976-977 (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). The validity of such physical coercion during a Terry stop is

determined by a totality of the circumstances analysis, and even the forced handcuffing of a suspect does not automatically elevate an investigatory detention to a de facto arrest. See e.g. Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992); United States v. Taylor, 716 F.2d 701, 708 (9th Cir. 1983). In Tom, even though he did not appear to be dangerous at the time, application of physical force to the suspect was deemed reasonable due to his evasive actions in a high-crime area. See 963 F.2d at 958. Axial to the justification of physical contact is "the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officers or others." Id. (quoting Graham, 490 U.S. at 394-396).

The Maguire Court, relying in part on both Tom and Graham, found that even though police officers wrestled Maguire to the ground, their actions did not constitute a de facto arrest. See 359 F.3d at 78. Examining the factual context of the case, the Court justified this heightened level of physical contact because the officers were "attempting to ensure their own personal safety." Id. The investigating officers were thus "entitled" to apply physical force in their search for weapons "if they felt their safety was threatened." Id. Although the officers testified that they did not wrestle Maguire to the ground until

they observed a "black handled item" in his waistband, the court declined to allow this single point to govern their analysis of the totality of the circumstances.  Id.

Given this, it is implausible to argue that Trp. Walls' seizure of Dancy constituted a de facto arrest.  Trp. Walls initiated physical contact for the express purpose of ensuring not only his personal safety, but that of his fellow officers and the patrons of Boomer's.  Entering the bar, Trp. Walls was confronted with an individual matching the description of a gunman [a gunman who had just been observed by another officer firing a weapon in the air], who immediately took evasive measures.  Trp. Walls was clearly permitted to physically restrain Dancy as he did.  Aside from the legal standards to the contrary, it would be dangerous precedent for this Court and society to deny Trp. Walls the opportunity to reasonably ensure the safety of himself and others on the scene.

Dancy's allegations that his split-second seizure instantly vaulted beyond the scope a valid Terry stop and became a de facto arrest are thus unsupportable.  Once past this, Trp. Walls' instantaneous discovery of Dancy's firearm renders moot any protestations regarding probable cause for arrest.

II.  THE REASONABLE SUSPICION REQUIRED TO INITITIATE AN INVESTIGATORY STOP AND/OR PAT-FRISK FOR WEAPONS EXISTED WHEN TROOPER WALLS AND THE OTHER OFFICERS FIRST ENCOUNTERED THE DEFENDANT

    A.  At the time of Dancy's arrest, responding officers possessed evidence sufficient to warrant a reasonable belief that Dancy was the the shooter, thus supplying probable cause for the arrest.

Under the rubric of the Fourth Amendment, it is well established that warrantless arrests require probable cause as against the arrestee, and such felony arrests may be executed in a public place. See United States v. Watson, 423 U.S. 411 (1976). Without probable cause, arrests circumventing the impartiality requirements for a warrant are considered beyond the scope of legitimate police activity. See Wong Sun v. United States, 371 U.S. 471, 482 (1963). The constitutional validity of the discovery of evidence is coextensive with the validity of the attendant warrantless arrest. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Evidence seized as a direct factual result of illegitimate police activity is deemed the "fruit" of such illegality and, as such, may not be used against the arrestee. See Wong Sun at 484-485 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)).

Fourth Amendment reasonableness standards govern the concurrent analyses of a warrantless arrest and the resulting

evidence. See Beck, 379 U.S. at 91. These analyses hinge on the existence of probable cause. See Id. If such probable cause exists, "the arrest, though without a warrant, [is] lawful," and the resulting evidence admissible. Watson, 423 U.S. at 417 (quoting Draper v. United States, 358 U.S. 307, 310 (1959)).

Identifying probable cause turns on the "assessment of probabilities in particular factual contexts [that are] not readily...reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). That probable cause is a "fluid concept," Id., was echoed by Chief Justice Rehnquist of the Supreme Court, who stated that "articulating precisely what...'probable cause' mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996). The existence of probable cause is informed, then, by whether the "facts and circumstances within [a police officer's] knowledge...were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck, 379 U.S. at 91.

Due to the rejection of formulaic judicial constructions of probable cause, courts reviewing warrantless arrests apply a totality of the circumstances test to determine whether the arrest was founded on probable cause. See United States v.

9

Reyes, 225 F.3d 71, 75 (1st Cir. 2000)(citation omitted).  See also Maryland v. Pringle, 540 U.S. 366, 371 (2003); United States v. Fiasconaro, 315 F.3d 28, 35 (1st Cir. 2002); United States v. Figueroa, 818 F.2d 1020, 1024 (1st Cir. 1987).  A court is expected to examine the totality of "events leading up to [an] arrest," and, from the standpoint of an objectively reasonable officer, review these facts in light of the *probability* that a suspect was engaged in criminal activity.  See Pringle, 540 U.S. at 371 (quoting Ornelas, 517 U.S. at 696).  The government, in providing evidence to satisfy this test, is required not to present "evidence sufficient to convict[,] but *merely enough to warrant a reasonable belief*" that a suspect was engaging in criminal activity.  Reyes, 225 F.3d at 75 (emphasis added).

　　Reliability of information also plays into the totality of the circumstances test.  See e.g. Gates, 462 U.S. 213 (probable cause based on detailed informants' tip that was independently verified by officers).  In Draper the Supreme Court stated that since the information at issue was received from a known and reliable source, and since the arresting officers personally verified innocent information contained in the tip, the arrest was surely based on probable cause.  See Draper, 358 U.S. at 313.  Even the fact that the arresting officers themselves did not

observe the suspect engage in any overtly criminal behavior could not persuade the Court otherwise.  See Id.

Here, an analysis of the totality of the circumstances surrounding Dancy's arrest indicates that his reach for the exclusionary sanction is baseless.  Trp. Walls' reasonable belief that Dancy was the shooter that Det. Mark Reardon had observed minutes earlier is unshakeable.  The totality of the circumstances here informing a probable cause analysis includes: 1) the high-crime environment in which the situation developed; 2) the expertise of the officers involved; 3) the accuracy and particularity of the shooter's description; 4) the gunman's flight to Boomer's Bar; and 5) the dire safety risk posed by an armed and dangerous suspect, who didn't hesitate to point and shoot his gun.

As the evidence bears out, Det. Reardon is an experienced and savvy officer of the law with years of investigationve and field experience, and his knowledge of Brockton and its criminal elements is unquestioned.  The detailed description of the gunman was drawn from his sustained sight line of a nearby suspect. Det. Reardon's instant post-arrest confirmation of Dancy as the Perkins Ave. shooter bears out the solidity of his observation. Contrary to what the defendant would have us believe, a measured

and accurate description was radioed by Det. Reardon to his fellow officers, one precise and effective enough for Trp. Walls to immediately recognize Dancy with a glance when entering Boomer's Bar. Indeed, all of the officers testified that, based on the description they heard over the radio, they immediately recognized Dancy when they entered Boomer's Bar. A comparison of the radioed description and Dancy's post-arrest Polaroid photo taken at the police station confirms Det. Reardon's accuracy.

     Furthermore, Trp. Walls received the shooter's description only minutes before Dancy's arrest from a detective whose expertise he knew. Trp. Walls was obviously justified in relying on this information in reasonably forming his belief that Dancy was the shooter. Entering Boomer's Bar, Trp. Walls instantly matched the description of an armed and dangerous gunman to Dancy. That Trp. Walls immediately grabbed Dancy was an instinctive reaction in the face of such a dangerous and rapidly developing situation. Upon seeing the officer, this suspect, on what Trp. Walls believed to be armed with a loaded handgun, turned abruptly and attempted to flee. Such evasive maneuvers could not but further confirm his belief that Dancy was the gunman. Further, Trp. Walls based his restraint of Dancy not only on matching an accurate and reliable description to Dancy

and his evasiveness, but also on the high probability that Dancy posed an imminent and deadly risk to Trp. Walls himself, the other officers and the patrons in the bar.  Given the known willingness of the suspect to publicly discharge a firearm, Trp. Walls' actions were surely calculated to prevent both intentional and accidental bloodshed inside Boomer's Bar and on the streets of Brockton.

By his motion, Dancy also implies a case of mistaken identity and impugns the basis for probable cause by emphasizing that as the shooter darted through the alley way towards Boomer's, Det. Reardon lost sight of him.  This is a spurious insinuation in light of Det. Reardon's immediate confirmation that Dancy was the shooter once inside Boomer's.  Even without such post-arrest rationalizations, it was wholly reasonable to determine that the shooter had entered Boomer's Bar given Det. Reardon's observation and knowledge of the surrounding area.

As a veteran of the Brockton Police Department familiar with the area, Det. Reardon did not see the shooter flee the block. He also knew that Boomer's Bar was a gathering place for individuals involved in the Brockton drug and gun scene.  The gunman was wearing only a sweatshirt when he fired the shot; Boomer's Bar was the logical source for a man without a winter

13

jacket in the cold December night.  It was surely reasonable for Det. Reardon to form a belief that after a jaunt outside to menace the men in the Mercedes Benz, the shooter returned immediately to the warmth of Boomer's Bar and his jacket.  That Dancy was arrested inside Boomer's Bar wearing a leather jacket right after he ran through the door lends further support for this belief.  And, lets not forget that Dancy was also wearing the same sweatshirt that Det. Reardon had observed under his jacket.

Dancy also argues that notwithstanding Det. Reardon's pronouncement that the shooter "looked similar" to David Taylor, the description and identification were in fact not accurate.  This is defused, however, with a cursory comparison of photographs of the two men, which allows their uncanny resemblance to spring forth.  Moreover, it was *Dancy* who was found inside Boomer's Bar armed with a handgun, *not* David Taylor.

Det. Reardon's expertise, the accuracy of his description, and its match to Dancy clearly indicate that Dancy's arrest was supported by probable cause.  The temporal and spacial proximity of Dancy's arrest to the shooting also militate toward this conclusion.  The above reasons, taken within the framework of a totality of the circumstances, demonstrate that probable cause

existed.

    B.    Even if Dancy's arrest was not supported by probable cause, his seizure by police was a valid <u>Terry</u> stop.

For Fourth Amendment purposes, a seizure occurs when a police officer restrains an individual's freedom to walk away from an interaction. See <u>Terry v. Ohio</u>, 392 U.S. 1, 16 (1968). Such seizures made without probable cause, previously considered unreasonable, were found to be legitimate in <u>Terry</u>. See <u>Id</u>. Police officers are permitted to conduct brief detentions and pat-frisks of persons against whom they have a reasonable suspicion of criminal activity. See <u>Terry</u>, 392 U.S. at 21-22; <u>United States v. Maguire</u>, 359 F.3d 71, 76 (1st Cir. 2004). Reasonable suspicion is a considerably less demanding standard than probable cause. See <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000)(citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)). The basis for this reasonable suspicion must be grounded in "more than [an] inchoate and unparticularized...hunch." <u>Maguire</u>, 359 F.3d at 76 (quoting <u>Sokolow</u>, 490 U.S. at 7)(internal quotation marks omitted).

The propriety of an investigatory detention depends on "whether the officer's actions were justified at their inception," <u>United States v. Trueber</u>, 238 F.3d 79, (1st Cir. 2001)(citations and internal quotation marks omitted). Also

15

scrutinized is whether "the scope of the stop was reasonable under the circumstances." Maquire, 359 F.3d at 77 (citation omitted). Initial justification for Terry stops can be based on "specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show...the stop was warranted." Id.

Here, Trp. Walls had a detailed description of an armed suspect willing to use his firearm. He was also cognizant that both the area and, in particular, the bar he was entering was rife with individuals involved in the narcotics trade. Trp. Walls entered Boomer's Bar and saw Dancy walking towards him. As discussed above, it is clearly logical that Trp. Walls instantly formed a reasonable suspicion that Dancy was the dangerous gunman: he matched Det. Reardon's detailed description given and received over the radio only minutes earlier.

The evasive movement of Dancy suggested flight and heightened Trp. Walls' suspicion towards him. It is well established that nervous and evasive behavior lends weight to an officers' formulation of reasonable suspicion. Id. (citing United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975)). Instead of defusing Trp. Walls' reasonable suspicion that he was the gunman, Dancy increased it by engaging in evasive maneuvers

suggesting attempted flight.  Further, in Wardlow, the Supreme Court held that unprovoked flight, by a suspect in a high-crime area, *upon seeing the police* was alone justifiable grounds on which to form reasonable suspicion.  See 528 U.S. at 124.  In light of such overwhelming evidence and precedent, Dancy apparently does not contest that Trp. Walls had legitimate reasonable suspicion to seize him.

## CONCLUSION

For all of the evidence and reasons advanced by the government thus far, the government respectfully requests that this Court deny the Defendant's Motion to Suppress Evidence.

```
                                    MICHAEL J. SULLIVAN
                                    United States Attorney
                              By:
                                    /s/Antoinette E.M. Leoney
                                    ANTOINETTE E.M. LEONEY
                                    Assistant U.S. Attorney
Dated: January 12, 2007             (617) 748-3103
```

## CERTIFICATE OF SERVICE

Suffolk, ss                              Boston, Massachusetts
                                         January 12, 2007

I, Antoinette E.M. Leoney, Assistant U.S. Attorney, certify that I caused a copy of the foregoing to be served by electronic court filing notice to Oscar Cruz, Jr., Esq., Federal Defender's Office, 408 Atlantic Avenue, 3rd Floor, Boston, MA 02210.

```
                                    /s/Antoinette E.M. Leoney
                                    ANTOINETTE E.M. LEONEY
```