UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10387-RGS

UNITED STATES OF AMERICA

v.

WILLIE DANCY


FINDINGS OF FACT,
RULINGS OF LAW, AND ORDER
ON DEFENDANT'S MOTION TO SUPPRESS


September 25, 2007

STEARNS, D.J.

Defendant Willie Dancy is charged as a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Dancy seeks to suppress the firearm (a .22 caliber revolver), the ammunition, and incriminating statements that he made after his arrest. Dancy challenges the probable cause for his arrest.

The evidentiary hearing on Dancy's motion was truncated. Evidence was initially heard on November 15, 2005. The hearing was then adjourned to December 20, 2005, to allow Dancy to call an additional witness. Dancy's retained attorney shortly thereafter withdrew his appearance together with the motion to suppress. Dancy was subsequently found indigent and Federal Defender Oscar Cruz, Jr., was appointed as successor counsel. In late 2006, Defender Cruz renewed the motion to suppress and requested an additional evidentiary hearing. The request was granted and a third hearing was

convened on November 7, 2006. Briefing and argument followed over the next several months. Dancy's motion to suppress is now ripe for decision.

## FINDINGS OF FACT

Based on the credible testimony, the court makes the following findings of fact.

1. At approximately 9:15 p.m. on December 8, 2004, Mark Reardon, a Brockton police detective with eighteen years of experience, stopped his unmarked patrol car at a traffic light at the intersection of Main Street and Perkins Avenue in Brockton. The intersection is at the epicenter of a high crime area infested with "[e]verything from narcotics to firearms to homocides [and] several armed robberies." Reardon observed a new "shiny-looking" Mercedes in the bay of a nearby gas station. Four males were milling about the car. Suspecting that the men were involved in drugs, Reardon began a check of the license number of the Mercedes. Before he could submit the request, the light changed. Reardon pulled through the intersection. He then circled back towards the gas station. As he did so, a black male who appeared to be in pursuit of someone came running in his direction along Perkins Avenue. As the man ran by Reardon's vehicle, he appeared "disgusted." He was holding a "full-size, large-frame semiautomatic," which he aimed in the direction of the Mercedes. He raised the gun and fired a shot in the air. He then began jogging towards an alleyway running off Perkins Avenue.

2. Reardon radioed a report of "shots fired" and requested assistance. He described the shooter as a black male with a cornrow hairstyle, dressed in a gray hooded sweatshirt with lettering and dark blue jeans. Reardon also stated that the man resembled

David Taylor, an individual well known to Brockton police. Reardon last observed the gunman disappearing into the alleyway.

    3. Reardon believed that the gunman was headed to Boomer's, a notorious drinking establishment, and one of the few places in the neighborhood that was open at that time of night. Reardon drove to a vantage point on Montello Street where he could observe the rear entrance to Boomer's. He was joined within minutes by members of a Massachusetts State Police anti-gang unit. The unit consisted of Brockton police officers Thomas Hyland and Michael Cesarini, and State Police Sergeant Mark Kiley and Trooper Frank Walls.

    4. Boomer's front entrance is on Perkins Avenue. At the rear of the bar is a door that opens on a smoking area and parking lot. The serving area is at the front of the rectangularly-shaped bar room. Two pool tables are at the rear of the bar next to the exit leading to the smoking area. Kiley and Walls stationed themselves at the rear door of Boomer's where they were joined by Hyland. Cesarini and Reardon decided "to go in through the front door and coordinate the entry."

    5. Trooper Walls entered Boomer's through the back door followed closely by officers Kiley and Hyland.[1] Reardon and Cesarini simultaneously entered through the front door. Walls saw Dancy, who strongly resembled the description broadcast by Reardon, standing a few feet away near one of the pool tables. A hooded sweatshirt was not visible – Dancy was wearing a black leather jacket – but his clothing otherwise matched the

---

[1] Walls was wearing a Massachusetts State Police sweatshirt. His badge and sidearm were also clearly visible.

description radioed by Reardon.[2] As Walls moved in Dancy's direction, Dancy turned and thrust his hand into the right pocket of the jacket. He then began to walk rapidly towards the front of Boomer's. Believing that Dancy was reaching for a gun, Walls grabbed his arm and the pocket of his jacket. He felt a hard object in the pocket that he knew from experience to be a firearm. Walls yelled "gun" several times to alert the other officers. Dancy retorted: "Get off me bitch, I ain't got no gun." A struggle then ensured. Hyland came to Walls's aid. At one point, Dancy broke free and attempted to give the gun, a .22 caliber revolver, to Michael Bourne, a bystander. Bourne refused to take it. Dancy dropped the gun to the floor where the cylinder broke loose.

6. On hearing Walls yell "gun," Cesarini and Reardon ran to the rear of the bar. As Cesarini neared the pool tables, he saw a 9-millimeter semi-automatic pistol being pushed beneath one of the tables by an individual later identified as Kevin Jones.[3] Cesarini ordered Jones to drop to the floor. As Jones did so, Hyland saw him kick the pistol further under the pool table. Cesarini grabbed the pistol and placed it on the pool table. Jones was taken into custody by Reardon.

7. Cesarini then joined the fray, spraying Dancy with a burst of pepper gas. Dancy was wrestled back to the ground by Hyland and Walls. Once Dancy was subdued, Hyland

---

[2]The leather jacket covered the sweatshirt. The booking photo taken after Dancy's arrest shows him dressed in a gray hooded sweatshirt consistent with the one Reardon had observed him wearing earlier on Perkins Avenue.

[3]The pistol was later found to be loaded with four bullets. An expended 9-millimeter shell casing was later found by another Brockton officer in the smoking area behind Boomer's. The casing was matched by a ballistician with the pistol.

picked up the pieces of the revolver.[4] The cylinder contained a round of live ammunition. A second cartridge was found in the pocket of Dancy's jacket.

8. Both Jones and Dancy were placed under arrest and transported to Brockton police headquarters for booking.[5] Jones and Dancy were then placed in adjacent holding cells. State Trooper Erik Telford, who was in the cell block area, overheard a conversation between Dancy and Jones. He heard Jones say to Dancy: "Yo Will, you know the Smith & Wesson don't take no prints." Jones continued: "Will, I'm getting charged with the big one and you're getting charged with the little one . . . ." Dancy replied: "I know . . . and you think it's my fault because I had to go do that shit[.]" Dancy then said to Jones that the officers had "found the burners [the guns] under the pool table, not in anyone's hand. They don't have shit."

## RULINGS OF LAW

Dancy's principal argument is that Trooper Walls lacked probable cause to initiate a seizure (arrest) of his person upon the initial encounter at Boomer's. An arrest occurs when in view of all of the surrounding circumstances, "a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554 (1980), or otherwise terminate an encounter with police. Florida v. Bostick, 501 U.S. 429, 436 (1991). Here there can be no dispute that Trooper Walls's attempt to physically restrain Dancy was a seizure tantamount to a formal arrest. "The word 'seizure' readily

---

[4]Walls testified (adamantly) that the revolver (or at least its frame) remained in the pocket of Dancy's jacket. I find Hyland's testimony that he retrieved the pieces of the pistol from the floor more consistent with the gun's broken condition.

[5]Bourne was arrested after he attempted to interfere with the arrest of Dancy.

bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." California v. Hodari D., 499 U.S. 621, 626 (1991).

An arrest must be supported by probable cause to be lawful. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Articulating precisely what "'probable cause' mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996). Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion) (citation omitted). "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity." United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986).

In assessing probable cause, courts are often guided by the "collective knowledge," or "fellow officer" rule: when police are engaged in a collaborative effort, the knowledge of each officer may be pooled in establishing probable cause. See United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002). Cf. United States v. Hensley, 469 U.S. 221, 232 (1985) (same, threshold inquiry doctrine). In Dancy's case, the knowledge and observations of Reardon and Trooper Walls leading to his seizure are to be considered collectively. The elements underlying the officers' showing of probable cause in Dancy's case are

particularly strong. They include the direct observation by an experienced officer of Dancy engaged in a criminal act (the discharge of a firearm in a public place, a violation of Mass. Gen. Laws c. 269, § 12E),[6] a reasonably thorough physical description,[7] an almost immediate apprehension (within three to five minutes of Reardon's initial observations),[8] an attempt by Dancy to evade contact with the officers,[9] and a furtive gesture by Dancy that Trooper Walls reasonably interpreted as threatening.[10]

---

[6] See United States v. Arvizu, 534 U.S. 266 (2002).

[7] See United States v. Martin, 28 F.3d 742, 744-745 (8th Cir. 1994) (minor inconsistencies between a defendant's appearance and an otherwise accurate description of his person do not detract from probable cause); United States v. Pinion, 800 F.2d 976, 979 (9th Cir. 1986) (same, inconsistencies in the description of defendant's clothing).

[8] Cf. United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1982).

[9] See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (unprovoked flight and nervous, evasive behavior are "pertinent factor[s] in determining reasonable suspicion"); United States v. Sokolow, 490 U.S. 1, 8-9 (1989) (suspect's "evasive or erratic path through an airport," and his apparent use of an alias, were relevant factors); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (suspect's "strange movements in his attempt to evade the officers aroused further justifiable suspicion"); United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) ("erratic driving or obvious attempts to evade officers can support a reasonable suspicion"); Sibron v. New York, 392 U.S. 40, 66-67 (1968) ("deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest"); Husty v. United States, 282 U.S. 694, 701 (1931) (finding of probable cause for search of automobile was based on, *inter alia*, "the prompt attempt of [the defendant's] two companions to escape when hailed by the officers").

[10] See United States v. Rideau, 969 F.2d 1572, 1575 (5th Cir. 1992) (en banc) (police office reasonably perceives a threat when a suspect in a high crime area appears nervous and backs away); United States v. White, 655 F.2d 1302, 1304 (D.C. Cir. 1981) (same).

Alternatively, even if the court was of the view (it is not) that probable cause was lacking, the officers at a minimum possessed the specific and articulable facts necessary to justify an investigative detention. See United States v. Cortez, 449 U.S. 411, 417-418 (1981). It is well established that events that occur subsequent to an otherwise lawful Terry stop can provide the additional information necessary for probable cause for an arrest.[11] Hensley, 469 U.S. at 235-236; United States v. Hernandez, 486 F.2d 614, 617 (7th Cir. 1973). Here, even if the initial seizure of Dancy by Trooper Walls was unjustified, Dancy's forcible resistance to the arrest would have been an intervening act sufficient to break the chain of causation and dissipate the taint of any illegality, thereby giving the officers fresh grounds for an arrest. See United States v. King, 724 F.2d 253, 256 (1st Cir. 1984); United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982). See also United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995) (resistance to an illegal arrest provides an independent ground for a second legal arrest).

Dancy's argument for suppression of the statements that he was overheard making while in the holding cell conversing with Jones is premised on the alleged illegality of his arrest. See Wong Sun v. United States, 371 U.S. 471, 488 (1963). Neither of the two briefs filed on Dancy's behalf offer anything more than one conclusory sentence on the subject. But it is not clear that a "fruit of the poisonous tree" theory would apply in any event given the spontaneous and voluntary nature of Dancy's statements and the absence

---

[11]The fact that physical force is used to effect a Terry stop is not determinative. "The right to verify or dispel suspicion is meaningless unless officers may, when necessary, *forcibly* detain a suspect." People v. Johnson, 231 Cal. App. 3d 1, 12 (Cal. App. 1991). See also Hensley, 469 U.S. at 224, 235 (a legitimate concern for police safety may justify a show of armed force).

of any element of police exploitation of the arrest.  See Brown v. Illinois, 422 U.S. 590, 604 (1975).  Because the court is of the view that police had ample probable cause to arrest Dancy, the motion to suppress the statements must perforce also be denied.[12]

---

[12]A statement volunteered by a suspect in custody is admissible whether or not the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), have been given.  See United States v. Shea, 150 F.3d 44, 48 (1st Cir. 1998).  Nor do police who are in a position to overhear have an obligation to interrupt a suspect's statement in order to caution himt that his words are incriminating.  See Arizona v. Mauro, 481 U.S. 520 (1987).

## ORDER

For the foregoing reasons, Dancy's motion to suppress the physical evidence and incriminating statements is <u>DENIED</u>.  The Clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE